IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BONNIE S. SIPLE-NIEHAUS, | ) | CASE NO.  5:15-cv-01167 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Bonnie S. Siple-Niehaus ("Plaintiff" or "Siple-Niehaus") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13.   As explained more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Siple-Niehaus protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on June 6, 2011.[1]  Tr. 17, 107-108, 150-151, 223-229, 230-235, 273.  Siple-Niehaus alleged a disability onset date of September 8, 2010.  Tr. 17, 223, 230, 272.   She alleged disability due to neck pain, vascular migraines, and shoulder pain. Tr. 96, 120, 154, 159, 163, 167, 172, 176, 179, 183, 276.   Siple-Niehaus's application was denied initially (Tr. 154-169) and upon reconsideration by the state agency (Tr. 172-185).

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 5/17/2016).

Thereafter, she requested an administrative hearing.  Tr. 187.  On October 8, 2013,

Administrative Law Judge Yelanda Collins ("ALJ") conducted an administrative hearing.[2]  Tr.

37-68.

      In her December 20, 2013, decision (Tr. 14-36), the ALJ determined that Siple-Niehaus

had not been under a disability at any time from September 8, 2010, through the date of the

decision.  Tr. 17, 29-30.  Siple-Niehaus requested review of the ALJ's decision by the Appeals

Council.  Tr. 7-13.  On April 14, 2015, the Appeals Council denied Siple-Niehaus's request for

review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, vocational and educational evidence

      Siple-Niehaus was born in 1975.  Tr. 223, 230, 272.  She was 38 years old, married and

living with her husband and 18 year-old daughter at the time of the administrative hearing.  Tr.

42-43.  Siple-Niehaus completed school through 11th grade.  Tr. 44.  She did not obtain a GED

or have any vocational training.  Tr. 44.  Siple-Niehaus last worked in 2009 and 2010 as a

cashier and office manager at Save-A-Lot.  Tr. 44-45.  She has worked as a cashier, semi-truck

washer, bartender, server, and a personal care assistant for elderly individuals.  Tr. 45-47.  She

has also performed assembly work, assembling window parts.  Tr. 45.

### B.    Medical evidence

#### 1.    Treatment history

      Siple-Niehaus first saw Dhia Hassani, M.D., at Affinity Family Physicians, in December

2009.  Tr. 512, 1007.  At that initial visit, Siple-Niehaus's complaints included migraines and

---

[2] Siple-Niehaus had appeared earlier for a hearing on April 18, 2013.  Tr. 77-83.  During that hearing, the ALJ
inquired as to whether Siple-Niehaus wanted to proceed unrepresented or with counsel.  Tr. 79.  Siple-Niehaus
indicated her desire to have counsel.  Tr. 80-81.  Accordingly, the hearing was postponed to allow Siple-Niehaus the
opportunity to obtain counsel.  Tr. 81.

possible depression.  Tr. 1007.   Dr. Hassani prescribed Maxalt.  Tr. 1007.  Siple-Niehaus

continued to complain of migraines when she saw Dr. Hassani on January 12, 2010.  Tr.  1006.

On February 11, 2010, Siple-Niehaus saw Dr. Hassani with complaints of abdominal pain, which

she had been having for five days.  Tr. 1005.  Dr. Hassani ordered abdominal and pelvic CT

scans.  Tr. 1005.   She did not complain of headaches during that visit.  Tr. 1005.  During a

follow-up visit on February 17, 2010, Dr. Hassani assessed irritable bowel syndrome, chronic

constipation, and anxiety.  Tr. 1004.  He recommended that Siple-Niehaus quit smoking, avoid

alcohol and caffeine, and try natural stool softeners and he prescribed Zantac.  Tr. 1004.  He also

recommended that Siple-Niehaus see a gastroenterologist.  Tr. 1004.

On March 3, 2010, Siple-Niehaus saw Dr. Hassani with complaints of migraines and

stomach discomfort.  Tr. 1003.  Siple-Niehaus reported that she had tried Zomig samples for her

headaches but it made her sick and did not help.  Tr. 1003.  She informed Dr. Hassani that four

years prior she had been in a motor vehicle accident and hit her head and neck.  Tr. 1003.  Prior

to the accident, Siple-Niehaus had minor headaches but, following the accident, her headaches

were more severe and occurred almost daily.  Tr. 1003.  Dr. Hassani observed some tenderness

in her sinuses and in her neck muscles with turning either way.  Tr. 1003.  Dr. Hassani

recommended that an ophthalmologist evaluate Siple-Neihaus's eyes and that Siple-Niehaus

undergo a CT scan of her head and sinuses and an x-ray of her neck.  Tr. 1003.  He prescribed

Tenormin and Vicodin, with instructions to go to the emergency room if necessary.  Tr. 1003.

Siple-Neihaus's March 12, 2010, brain CT and cervical spine x-ray were normal.  Tr. 359, 384.

A paranasal CT showed diffuse mucosal thickening in all  paranasal sinuses consistent with

chronic postinflammatory change but no abnormal air-fluid levels or other evidence of acute

sinusitis. Tr. 360.

Siple-Niehaus saw William Novak, M.D., at Akron Neurology, Inc., in May 2010 and August 2010 for her headaches/migraines. Tr. 479-485, 579.  In May 2010, Siple-Niehaus reported having headaches every day.  Tr. 480.  Dr. Novak prescribed Topamax, Magnesium Oxide, and Naproxen (not to be used daily). Tr. 482.  In August 2010, Siple-Niehaus was having some degree of a headache every day.  Tr. 479.  Migraines were occurring 3 days per week.  Tr. 479.  In August 2010, Dr. Novak indicated that Siple-Neihaus's attention span and concentration and her recent and remote memory were normal.  Tr. 479.  Dr. Novak indicated that there had been some improvement in Siple-Neihaus's headaches.  Tr. 479.  He increased the Topamax dose, added Neurontin and advised Siple-Niehaus to continue with the Magnesium Oxide and Naproxen as previously prescribed.  Tr. 479.

Following a diagnosis of endometriosis, Siple-Niehaus saw Dr. Hassani on August 25, 2010.  Tr. 999.  During that visit, Siple-Niehaus reported that her headaches had gotten "terribly worse."  Tr. 999.  She reported that she had seen a neurologist but the medications he had prescribed had not really worked.  Tr. 999.  Dr. Hassani assessed "migraine headache with poor response, if any, to the current medications" and "endometriosis."  Tr. 999.  He tapered Siple-Neihaus's medication that could not be stopped immediately and prescribed Imitrex.  Tr. 999.

Upon Dr. Hassani's request, on September 22, 2010, James R. Bavis, Jr., M.D., of the NeuroCare Center, evaluated Siple-Niehaus.  Tr. 356-358.  Siple-Neihaus's chief complaints were intractable headaches for two months, pain in the right paraspinal region referred down into the arm and shoulder, and pain in the hips and anterior thighs.  Tr. 356.  Siple-Niehaus reported that her headaches had been resistant to all types of therapies.  Tr. 356.  She indicated that, for about two months, she had been taking 2 Tylenol and 4 ibuprofen almost every 4 hours to try to keep her pain under control.  Tr. 356.  Dr. Bavis's impression included chronic daily headaches,

medication-overuse headache, intractable migraine, sciatica-distribution pain, and pain, weakness, and numbness in the right arm and leg.  Tr. 357.  Dr. Bavis's recommendations/plan were (1) EMG/nerve conduction study of the right arm and right leg; (2) overnight polysomnogram; (3) obtain copies of the MRIs and CT scans that had already been performed; (4) prednisone titration (5 days); (5) IV headache infusion; (6) bilateral occipital nerve blocks; (7) Imipramine 10 mg titrating to 50 mg every evening; and (8) discontinue ibuprofen and Tylenol and use tizanidine and gabapentin until headaches are under control.  Tr. 357-358.

On September 30, 2010, Siple-Niehaus saw Dr. Hassani reporting that she was having "uncontrolled, basically resistant, vascular headaches."  Tr. 994-995.  She again reported having seen a neurologist but the medications that were prescribed were not really working.  Tr. 994. She was intolerant and allergic to opiates (Vicodin and Percocet) and therefore could not use. Tr. 994.  Dr. Hassani's assessment was "Migraine headaches, resistant to current treatment."  Tr. 994.  He indicated that he was going to see Siple-Niehaus again in three weeks and was "going to disable her and keep her away from light and noise."  Tr. 994, 995.

Dr. Bavis referred Siple-Niehaus to physical therapy, with diagnoses of headaches, cervicalgia, shoulder pain, and frozen shoulder.  Tr. 386.  An initial evaluation was conducted in early October 2010.  Tr. 386-388.  Physical therapist Brian S. Coote recommended physical therapy two to three times each week.  Tr. 387.  Siple-Niehaus was discharged from physical therapy in November 2010 for failure to show for most appointments.  Tr. 385.  Siple-Niehaus indicated that she was having severe headaches and undergoing injections and had forgotten about her appointments.  Tr. 385.

On October 12, 2010, Siple-Niehaus underwent a headache infusion protocol at the NeuroCare Center.  Tr. 355.  The infusion protocol included a variety of injectables, including

Benadryl, Depacon, Zofran, DHE45, Toradol, Ativan, and Decadron. Tr. 355.  Following the procedure, Siple-Niehaus had a "modest degree of pain relief."  Tr. 355.

At a follow-up appointment with Dr. Bavis on November 18, 2010, Siple-Niehaus reported that the headaches and neck pain were doing better.  Tr. 353-354.  However, she reported feeling dizzy and sleepy as a result of the headache infusion.  Tr. 353.  Dr. Bavis advised that was just part of getting so many medications through an IV and it was not anything to worry about. Tr. 353.  Dr. Bavis indicated that Siple-Neihaus's EMG/nerve conduction study of the right upper and lower extremity was normal.  Tr. 353.  Since Siple-Niehaus was doing better with her headaches, Dr. Bavis recommended no changes to her current medication regimen.  Tr. 353.  Since Siple-Neihaus was not having much neck or other discomfort, Dr. Bavis recommended only keeping an eye on those symptoms.  Tr. 353.

Upon Dr. Hassani's referral, Siple-Niehaus saw pain management specialist Jamesetta Lewis, D.O., of Affinity Medical Center, on November 21, 2010.  Tr. 500-503.  Siple-Niehaus reported having migraine headaches 3 times a week, with a typical migraine lasting 2 to 3 days.  Tr. 500.   When having a migraine, Siple-Niehaus reported having blurred vision, diplopia, nausea, vomiting, photophobia, and noise sensitivity.  Tr. 500.  She indicated that her migraines were worse with sun exposure.  Tr. 500.  She said she is constantly in pain and wakes every morning with a "daily cluster headache."  Tr. 500.  She described her pain as constant, sharp, tingling, shooting, tender and unbearable.  Tr. 500.  Nothing makes her pain better and her pain is worse with prolonged lifting, stretching, standing and walking.  Tr. 500.  She has weakness in both arms and in her neck and has numbness in her shoulders and arms.  Tr. 500.  Siple-Niehaus reported that the infusion from NeuroCare did not provide sustained pain relief.  Tr. 500.  She also reported that physical therapy provided her with 0% pain relief.  Tr. 501.  Dr. Lewis's

overall impression was (1) intractable headache secondary to migraine cephalgia versus cervicogenic versus bilateral occipital neuralgia; (2) myofascial pain syndrome; (3) generalized anxiety disorder; (4) chronic insomnia secondary to pain; and (5) other medical conditions, including endometriosis.  Tr. 502.  Dr. Lewis recommendations included recording her headaches on a daily and monthly basis in order to determine whether treatment was effective.  Tr. 502.  Dr. Lewis instructed Siple-Niehaus to record any type of triggers relating to her headaches as well.  Tr. 502.  Siple-Niehaus was smoking 1-1/2 packs per day.  Tr. 501.  Dr. Lewis also recommended that Siple-Niehaus stop smoking, noting that Siple-Niehaus's chronic pain would not improve unless she stopped smoking.  Tr. 502.  Dr. Lewis prescribed Metoprolol, MS-IR, and Zanaflex, and discontinued Neurontin. Tr. 502.  She also discussed other procedures such as propofol infusion, bilateral occipital blocks and spinal cord stimulation trial.  Tr. 502.  Siple-Niehaus wanted to hold off on those procedures.  Tr. 502.

Siple-Niehaus saw Dr. Lewis[3] on various occasions between December 2010 and July 2011. Tr. 498-499 (12/22/10); 496-497 (1/17/11); 4/7/11(492-493); 490-491 (7/13/11).  Examination findings during these visits included bilateral nystagmus (Tr. 501); tenderness to palpation (Tr. 490, 492, 497, 498); spasms and trigger points (Tr. 490, 492, 498); bilateral occipital neuralgia (Tr. 497, 502); diminished cervical range of motion (Tr. 497, 502); and bilateral cervical facet loading (Tr. 492, 497, 498, 502).

During her December 22, 2010, visit at Affinity Medical Center, Siple-Niehaus reported that she had cut back her smoking to 6 or 7 cigarettes per day.  Tr. 498.  She also reported having been seen at the emergency room for a migraine on December 14, 2010.  Tr. 498.   An injection was administered, which helped.  Tr. 498.  Siple-Niehaus believed that the injection was

---

[3] During certain visits, Siple-Niehaus was seen by a physician assistant but the physician assistant discussed the assessment and plan with Dr. Lewis and Dr. Lewis signed the treatment notes along with the physician assistant. *See e.g.*, Tr. 493, 499.

morphine, Toradol and Phenergan.  Tr. 498.  During a January 2011 visit, Dr. Lewis noted that
Siple-Niehaus was still smoking and advised Siple-Niehaus that, if she continued to actively
smoke, her headaches would never resolve.  Tr. 496.  Zanaflex was minimizing Siple-Niehaus's
pain to a dull ache.  Tr. 496.  However, the MS-IR was not working to control Siple-Niehaus's
acute flare-ups of pain.  Tr. 496.  Siple-Niehaus had not tried Cafergot so Dr. Lewis discontinued
the MS-IR and started Siple-Niehaus on Cafergot.  Tr. 496-497.  Dr. Lewis also recommended
bilateral occipital nerve blocks.  Tr. 496-497.  Dr. Lewis also provided Siple-Niehaus with
information regarding a spinal cord stimulator trial.  Tr. 497.

A bilateral occipital nerve root block was performed on March 8, 2011.  Tr. 494-495.  At
an April 7, 2011, follow-up visit, Siple-Niehaus reported 100% relief following the nerve block.
Tr. 492.  However, the pain relief had decreased to 60-75% at the time of the April 7, 2011, visit.
Tr. 492.  During the April 7, 2011, visit, Siple-Niehaus reported that she was using Zanaflex,
Toprol, Cafergot and leftover MS-IR to control her pain.  Tr. 492.  Dr. Lewis advised Siple-
Niehaus to continue using the Zanaflex, Toprol, Cafergot and instructed her that she could start
back on MS-IR.  Tr. 492.  Dr. Lewis cautioned Siple-Niehaus, however, that she should call the
office before making any changes on her own to her narcotic medication. Tr. 492.

In July 2011, Siple-Niehaus saw Dr. Lewis with complaints of worsening migraines and
an increase in her muscle spasms.  Tr. 490.  Siple-Niehaus was taking Robaxin and reported that
it was helping more than the Zanaflex but not as much as she would like.  Tr. 490.  She was
continuing to use the MS-IR and Toprol.  Tr. 490.  Dr. Lewis discussed the spinal cord
stimulator trial and Siple-Niehaus indicated she would consider it.  Tr. 490.  Another bilateral
occipital nerve injection was scheduled.  Tr. 490.  Dr. Lewis also prescribed Axert to be taken at
the onset of a headache.  Tr. 490.  Siple-Niehaus indicated that past medications of Cafergot,

Imitrex, Replpax and imipramine either did not work or were not covered by insurance.  Tr. 490-491.

Dr. Lewis performed another bilateral occipital nerve block on August 2, 2011. Tr. 656-657.   During an October 2011 visit with Dr. Lewis, Siple-Niehaus reported that she received relief from the August 2011 nerve block but it only lasted 3 days.  Tr. 658.  She reported having gone to the emergency room on September 19, 2011, with complaints of neck spasms and migraine headache.  Tr. 658.  At the emergency room, Siple-Niehaus received injections of Valium and Phenergan.  Tr. 658.  Siple-Niehaus reported only minimal (1 week) relief from past IV infusion therapy.  Tr. 658.  She had not been maintaining her headache diary.  Tr. 658.  She was using her TENS unit but only getting short term pain relief.  Tr. 658.  On examination, there was some positive tenderness along the bilateral greater occipital nerve root distribution and cervical paraspinal musculature region down into bilateral upper trapezius muscles with palpation.  Tr.  659.  Dr. Lewis recommended a cervical spine MRI, continuation of Robaxin and MS-IR, a change in the Toprol dose, and initiation of Amerge to be taken for acute migraine flare-ups.  Tr. 659.  Dr. Lewis advised Siple-Niehaus that keeping a record of her migraines was critical to determining whether a particular medication regimen was effective to controlling her migraines.  Tr. 659.  Dr. Lewis also indicated that Siple-Niehaus should continue to use her TENS unit for pain control.  Tr. 659.   A cervical MRI was obtained on October 27, 2011 (Tr. 528), which showed minor scoliosis of the cervical thoracic junction due primarily to muscle spasms as well as a small disk prolapse at C5-C6, without mass effect (Tr. 528, 661).

Siple-Niehaus saw Steven Gunzler, M.D., at the Neurological Institute of University Hospitals, in October and November 2011.  Tr. 1029-1030 (10/25/11);[4] 1027-1028 (11/28/11).

---

[4] The first page of the Dr. Gunzler's October 25, 2011, treatment notes appears missing from the record.

On November 28, 2011, Dr. Gunzler administered a botulinum toxin injection to target both the muscle spasms and the chronic migraine headache. Tr. 1027-1028, 1029-1030.

Siple-Niehaus continued to see Dr. Lewis through at least April 2013 (Tr. 661-662 (12/19/11); 701-702 (2/14/12); 705-706 (5/4/12); 709-710 (7/16/12); 894-895 (9/25/12); 903-905 (11/8/12); 898-900 (1/8/13); 901-902 (4/9/13)) with an additional bilateral occipital nerve block being administered (703-704 (2/28/12)).  On May 4, 2012, Siple-Niehaus reported that the occipital nerve block in February 2012 provided some relief but it lasted for only a couple of weeks.  Tr. 705.  Also, during her May 4, 2012, visit Siple-Niehaus reported having had to go to the emergency room 4 times since her last office visit due to migraine and neck spasms.  Tr. 705. Trigger point injections in the neck and upper thoracic region were recommended, along with continuing with her medication as prescribed (MS-IR, Cymbalta, Skelaxin, and Relpax), and using heat, massage and her TENS unit.  Tr. 705.  On May 22, 2012, Dr. Lewis administered the recommended trigger point injection at bilateral cervical paraspinal musculature region and bilateral upper trapezius muscles.  Tr. 707-708.

On July 16, 2012, Siple-Niehaus saw Dr. Lewis with her chief complaint being chronic neck and right shoulder pain.  Tr. 709.  Overall, Siple-Niehaus reported that the occipital nerve blocks helped reduce her overall headaches.  Tr. 709.  However, she continued to have persistent neck and right arm pain.  Tr. 709.  Siple-Niehaus had not been to the emergency room since her last office visit with Dr. Lewis.  Tr. 709.  The TENS unit was not providing significant relief. Tr. 709.  She had stopped using the Skelaxin for insurance reasons.  Tr. 709.  Samples of Zanaflex were provided for additional relief.  Tr. 709.  During a September 25, 2012, visit with Dr. Lewis, Siple-Niehaus reported that her pain was worse in her upper back and she described the pain as burning, stabbing, shooting, sensitive, numbness, tingling, throbbing and sharp.  Tr.

894.  She did not feel that her medication was helping.  Tr. 894.  The trigger point injections had only helped her for about a week.  Tr. 894.  Dr. Lewis recommended that Siple-Niehaus continue with her medication.

On November 8, 2012, Siple-Niehaus saw Dr. Lewis with complaints of right neck pain. Tr. 903-904.  She had been seen at the emergency room on November 5, 2012, for muscle spasms that turned into a migraine.  Tr. 903.  Siple-Niehaus's medications were helping some. Tr. 903.  However, she reported that her pain was interfering significantly with her general activity, normal work patterns, relations with other people, sleep patterns and overall enjoyment of life.  Tr. 903.  Dr. Lewis noted that she had discussed with Siple-Niehaus various treatment options, including spinal cord stimulator, ketamine and propofol infusions, botox injections, and sphenopalatine ganglion blocks, but Siple-Niehaus was not interested in pursuing.  Tr. 903.  Dr. Lewis recommended a cervical MRI, discontinuing MS-IR and starting Dilaudid, changing the Toprol dose, continuing Relpax, discontinuing Zanaflex, starting a new sleep aid, performing a right cervical selective nerve root block. Tr. 904.

A cervical spine MRI was taken on December 5, 2012.  Tr. 898.  On December 19, 2012, Dr. Lewis performed a right cervical selective nerve root block at C5 and C6.  Tr. 896-897.

During a January 8, 2013, visit with Dr. Lewis, Siple-Niehaus complained of headache pain.  Tr. 898.  Dr. Lewis received Siple-Niehaus's December 5, 2012, cervical spine MRI, indicating that the MRI showed some mild reversal of the normal cervical lordosis.  Tr. 898. Otherwise, Dr. Lewis indicated that the MRI was unremarkable.  Tr. 898.  In light of the MRI findings showing no structural abnormality in the neck, Dr. Lewis believed that Siple-Niehaus's ongoing right arm and neck pain were primarily related to cervical tension headaches, occipital neuralgia, and a history of migraines. Tr. 898.  The December 2012 nerve block was not

11

successful.  Tr. 898.  Siple-Niehaus had not had any recent emergency room visits.  Tr. 898.  Dr. Lewis noted that Siple-Niehaus had undergone multiple therapies, including botox, infusion therapy, and multiple migraine headache medications.  Tr. 898.  Siple-Niehaus did not have a headache diary and could not recall whether the medications helped reduce the frequency of her headaches.  Tr. 898.  Siple-Niehaus had run out of Dilaudid four days earlier, which Dr. Lewis indicated could have been contributing to her heightened level of pain.  Tr. 898.  Dr. Lewis discussed repeating the occipital nerve blocks because Siple-Niehaus had gotten some relief from the procedure in the past and she discussed other options.  Tr. 899.  Siple-Niehaus indicated that she was very comfortable with her medications at that time.  Tr. 899.

Between February 2010 and February 2013, Siple-Niehaus had multiple emergency room visits, with complaints of exacerbations of migraines, headaches, neck spasms, and neck pain, and she was given medications for her pain. Tr. 852-853 (2/24/10); 854 (10/11/10); 467-473 (12/14/10); 460-466 (12/29/10) (reporting migraine headaches 3-4 times per month); 453-459 (1/2/11); 445-452 (2/10/11) (reporting migraines 8-10 times per month); 432-438 (3/27/11); 425-431 (4/14/11); 418-424 (4/24/11); 410-417 (5/6/11) (reporting exacerbations of her headaches 10-15 times per month); 401-409 (5/23/11); 393-400 (6/27/11); 551-557 (8/31/11); 543-550 (9/19/11); 536-542 (10/2/11); 529-535 (10/19/11) (reporting migraine headaches 13-15 times per month and needing to go to the emergency room 3-4 times each month because her medication does not work); 520-527 (11/18/11); 955-956 (12/14/11); 953-954 (12/27/11); 875-876 (1/19/12); 941-942 (3/8/12); 939-940 (3/25/12); 933-934 (4/16/12); 926-927 (9/18/12); 924-925 (11/4/12); 922-923 (12/3/12); 920-921 (1/12/13); 914-916 (2/23/13).

In addition to treatment for her physical impairments, Siple-Niehaus was receiving mental health treatment at the Counseling Center of Wayne and Holmes Counties.  Tr. 670.  An

intake assessment was conducted on March 1, 2011.  Tr. 670.  Preliminary diagnoses were major depression recurrent with psychotic features and post traumatic stress disorder.  Tr. 670.  During the course of her mental health treatment, among other matters, observations were made regarding her physical condition, daily activities, concentration, memory and intellect.  For example, on March 12, 2012, Siple-Niehaus was observed during a counseling session to be "clearly uncomfortable due to a headache" Tr. 699.  During an April 30, 2012, session, it was noted that Siple-Niehaus had a headache and "appear[ed] [to be] in pain." Tr. 689.  On May 1, 2012, Siple-Niehaus cancelled a therapy session due to a migraine, explaining that she was too ill to attend.  Tr. 688.  During a session on May 16, 2012, Siple-Niehaus was observed "holding her head and [was] in obvious pain"—  Siple-Niehaus was "having a severe migraine and plan[ned] to go the ER after her appointment."  Tr. 686.  On June 12, 2012, Siple-Niehaus reported having migraines 10-15 days out of each month (Tr. 680) and, on June 27, 2012, she reported having migraines 10-12 time per month (Tr. 678).  In July and September of 2012, Siple-Niehaus discussed with her counselor the fact that her pain was affecting her ability to perform housework.  Tr. 771, 786.  During an October 2012, counseling session, Siple-Niehaus's counselor communicated with Dr. Lewis and explained the Siple-Niehaus was suffering from a great amount of pain and it was affecting her daily activities and mental health.  Tr. 760, 766.  Dr. Lewis relayed that Siple-Niehaus had been offered three surgical options and also noted that Siple-Niehaus's last urine screen showed morphine levels in levels higher than the prescribed amount.  Tr. 760.

During an initial psychiatric evaluation on April 26, 2012 (Tr. 690-691), on examination, Siple-Niehaus's concentration and memory were intact (Tr. 691).  During mental examinations in September 2012, January 2013, March 2013, May 2013, and August 2013 mental health

providers noted that Siple-Niehaus's concentration and memory were fair and her intelligence was average.  Tr. 730-731, 740, 781, 982, 966.  In March 2013, Siple-Niehaus informed her counselor that she had gotten engaged and was getting married in August.  Tr. 730, 982.  Siple-Niehaus's aunt was helping her with the wedding plans.  Tr. 982.  During an April 12, 2013, counseling session, Siple-Niehaus was not feeling well due to a migraine, back and shoulder pain, but she remained actively engaged and participated in the conversation.  Tr. 975.  In May 2013, Siple-Niehaus relayed that she was helping take care of her first grandchild.  Tr. 966.

> **2.  Opinion evidence**
>
>> **a.  Treating medical providers**

**<u>Dr. Lewis</u>**

On August 15, 2011, at the request of the State agency adjudicating Siple-Niehaus's disability claim, Dr. Lewis completed a questionnaire. Tr. 487-489.  Dr. Lewis noted that Siple-Niehaus's diagnoses were intractable headaches secondary to migraine cephalgia and cervicogenic (tension) headaches; bilateral occipital neuralgia; cervical facet arthropathy; and generalized anxiety disorder.  Tr. 488.  Dr. Lewis noted the following findings on clinical examination: bilateral nystagmus; bilateral occipital pain with palpation around the greater and lower occipital region; diminished cervical extension; and positive cervical facet loading bilaterally. Tr. 488.  Dr. Lewis indicated that the following diagnostic testing was available: CT brain scan, cervical spine x-ray, and spinal scan of the paraspinal sinuses.  Tr. 488.  Dr. Lewis reported that Siple-Niehaus was taking morphine sulfate, Robaxin, Relpax, Imitrex, and Toprol, which had an overall effectiveness rate of 20-30%.  Tr. 489.  Dr. Lewis indicated that Siple-Niehaus was compliant with her prescribed medications.  Tr. 489.  In addition to medication, Siple-Niehaus had tried other types of therapy/treatment, including occipital nerve blocks.  Tr.

489.   Dr. Lewis indicated that the occipital nerve blocks were 100% effective, noting that they she was awaiting a spinal cord stimulator decision.  Tr. 489.  The physical therapy was not effective at all.  Tr. 489.   When asked to describe any limitations that Siple-Niehaus's impairments imposed on her ability to perform sustained work activity, Dr. Lewis opined that Siple-Niehaus's "limitations were primarily related to intractable headaches interfering [with] ability to concentrate [and] think clearly.  She would require a quiet working environment without a lot of external stimulation."  Tr. 489.

On June 10, 2013, Dr. Lewis offered a check-box form opinion regarding Siple-Niehaus's abilities and limitations.  Tr. 906-907.  Dr. Lewis opined that Siple-Niehaus had no difficulty standing/walking, sitting, lifting/carrying, fingering, handling or reaching.  Tr. 906-907.   However, Dr. Lewis opined that Siple-Niehaus suffered from pain that "prevents [her] ability to concentrate occasionally, [she] likely would be off task 20% to 33% of the time."  Tr. 907.  Dr. Lewis explained that the following conditions were causing Siple-Niehaus's pain: "migraine cephalgias, cervicogenic headaches, and [bilateral] occipital neuralgia."  Tr. 907.

**Dr. Hassani's office**

On August 30, 2011, Dr. Hassani's office completed a State agency questionnaire.[5] Tr. 511-513.  The author of the questionnaire listed Siple-Niehaus's diagnosis as chronic migraines, 3-4 days per week, lasting 24 or more hours.  Tr. 512.   It was noted that Siple-Niehaus's symptoms started when she was age 15.  Tr. 512.  Siple-Niehaus's medications included Toprimate, Robaxin, morphine and Relpax.  Tr. 513.   When asked to describe Siple-Niehaus's response to therapy, it was indicated that, "generally, medical intervention has been minimally

_____

[5] As noted below, the ALJ attributed the August 30, 2011, questionnaire to Dr. Hassani.  Tr. 26.  However, the signature on that opinion is not legible and Siple-Niehaus is not certain that the opinion was in fact completed by Dr. Hassani.  Doc. 15, pp. 18-19, n. 3. However, it does appear that the questionnaire was completed by someone associated with the Affinity Medical Family Medical Center.  Tr. 511.

effective." Tr. 513. There were no reported compliance issues that interfered with treatment.   Tr. 513.   When asked to describe any limitations that Siple-Niehaus's impairment imposed on her ability to perform sustained work activity, Dr. Hassani's office stated, "3-4 days a week, the [patient] is unable to do anything requiring concentration or any sustained effort."  Tr. 513.

### Consultative examining psychologist

On January 26, 2012, Robert F. Dallara, Jr., Ph.D., performed a psychological evaluation. Tr. 664-669.   Siple-Niehaus indicated to Dr. Dallara that she would have difficulties working because of migraines and problems with her neck.  Tr. 664, 667.   She reported that she lost jobs due to migraines. Tr. 665.  During the evaluation, Dr. Dallara noted that Siple-Niehaus had poor eye contact and kept her head buried in her hands, complaining of a headache. Tr. 665.  He also noted, however, that she was alert and oriented to time, place, person, and situation.  Tr. 666. Siple-Niehaus reported some problems with memory, stating she forgets conversations and where she has placed things.  Tr. 666.

Dr. Dallara assessed Siple-Niehaus's functional abilities and limitations in four areas.  Tr. 667-668.  In the area of understanding, remembering, and carrying out instructions, Dr. Dallara opined that Siple-Niehaus "would be expected to be able to understand and apply instructions in a work setting consistent with low-average intellectual abilities."  Tr. 667.  With respect to Siple-Niehaus's ability to maintain attention, concentration, and in maintaining persistence and pace, to perform simple tasks, and to perform multi-step tasks, Dr. Dallara indicated that there was "no direct evidence during the examination to suggest impairment to her persistence or pace.  She was generally able to track the flow of conversation adequately during examination and did not show easy distractibility."  Tr. 668.  Dr. Dallara noted, however, that Siple-Niehaus reported difficulties with concentration due to headaches.  Tr. 668.   In the area of responding

appropriately to supervision and to coworkers, Dr. Dallara opined that "due to her depression and anxiety, she would have some difficulties relating to others including fellow workers and supervisors."  Tr. 668.  With respect to Siple-Niehaus's ability to respond appropriately to work pressures in a work setting, Dr. Dallara opined that, although Siple-Niehaus had not reported a pattern of inability to adjust to workplace demands and did not describe a history of mental or emotional deterioration as a result of work exposure, "due to her depression and anxiety, she would have some difficulties withstanding stress and pressure associated with day-to-day work activity."  Tr. 668.

### State agency reviewing physicians

On September 13, 2011, State agency reviewing physician Teresita Cruz, M.D., completed a physical RFC assessment, opining that Siple-Niehaus could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push and pull unlimitedly (except as limited for lift/carry).  Tr. 102.  Dr. Cruz opined that Siple-Niehaus would be limited to occasional climbing of ladders/ropes/scaffolds; limited to frequent overhead lifting bilaterally; and must avoid even moderate exposure to hazards.  Tr. 103-104.   In offering her opinion regarding Siple-Niehaus's RFC, Dr. Cruz considered evidence regarding Siple-Niehaus's migraines and cervical issues.  Tr. 102-104.

On January 4, 2012, State-agency reviewer Elizabeth Das, M.D., rendered the same opinion as Dr. Cruz regarding Siple-Niehaus's RFC. Tr. 130-132.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

Siple-Niehaus was represented at and testified at the hearing.  Tr.  42-62.  She described her education and past work experience.  Tr. 44-47.  She explained that she last worked at Save-A-Lot in 2010.  Tr. 47.  She was let go because she was missing too many days of work due to migraines.  Tr. 47, 61-62.  She indicated that she had never left a job for another one and was always fired due to absences.  Tr. 62.

Siple-Niehaus explained that she felt she was unable to work anymore because she has frequent migraines, neck spasms and her right arm goes numb.  Tr. 47.  She also indicated that she has problems concentrating.  Tr. 53-54.  She explained that sometimes she cannot complete a sentence or she forgets what she was going to do.  Tr. 54.  She indicated that, even before she stopped working, she had problems with concentration and focus and the extent of her problems in that regard had remained about the same.  Tr. 54.  Siple-Niehaus's neck spasms and headaches started when she was 15 years old with the symptoms gradually getting worse.  Tr. 50.  The numbness in her right arm had started to occur more recently.  Tr. 51.  She indicated that her doctor advised her that her problems were being caused by prolapsed and bulging discs in her cervical spine that were hitting her nerves and shooting pains into her head.  Tr. 47-48, 51.  She has tried injections to help with the pain but reported that the injections only provide two or three days of relief and even then she is not entirely pain-free.  Tr. 49.  Her medication dulls the pain but it does not go away.  Tr. 49.  Her medication makes her drowsy.  Tr. 52-53.

On good days, her pain level is a 6 on a scale of 0-10 and, on bad days, her pain level is a 10.  Tr. 49.  Siple-Niehaus estimated having about two or three good days in a week.  Tr. 49.

When she is having a bad day, she usually stays in bed all day with dark curtains.  Tr. 49.   On

certain days, her pain is so bad that she has to go to the hospital.  Tr. 49.  When she goes to the

hospital, she gets a shot.  Tr.  61.  She estimated having had to go to the hospital about 20 times

that year.  Tr. 49-50.

Siple-Niehaus discussed her daily activities, indicating that she usually wakes up around

11:30 a.m. and watches television.  Tr. 58-59.  However, she does not watch television when she

has a migraine.  Tr. 60.  When she has a migraine, she is unable to concentrate.  Tr. 60.  She

usually goes to bed between 10:30  and 11:00 p.m.  Tr. 59.  Approximately three days each

week, Siple-Niehaus drives her daughter to work, which is about six blocks from their home.  Tr.

43-44, 59.  Since around 2011, Siple-Niehaus's daughter started performing most of the

household chores.  Tr.  55-56.  Siple-Niehaus does some minimal cooking, she goes grocery

shopping with her husband and daughter, and goes out to dinner once or twice a month.  Tr. 56-

57, 59-60.  She visits with her mother-in-law across the street approximately three times each

week.  Tr. 57-58.  She does not have friends in Ohio but talks to one friend via phone and she has

a Facebook and/or email account.  Tr. 58.  Before her daughter graduated from high school,

Siple-Niehaus would attend her daughter's school events but there were times that she missed

events because of her migraines and neck problems.  Tr. 58, 60.

### 3.    Vocational Expert

#### a.    Hearing testimony

Vocational Expert ("VE") Ted S. Macy provided a vocational consultant case analysis

(Tr. 318-319) and testified at the hearing (Tr.  62-68).

The VE summarized Siple-Niehaus's work history, indicating that she had worked as (1)

a cashier, a light, unskilled position; (2) a production assembler, a light, unskilled position; (3) a

waitress, a light, semi-skilled position; (4) a bartender, a light, semi-skilled position; and (5) a nursing assistant, a medium, semi-skilled position.[6]  Tr. 62-63.  The ALJ then asked the VE to assume an individual who could perform a range of light work; frequent pushing and pulling with hand controls on the right; frequent overhead reaching on the right; no climbing of ropes, ladders, or scaffolds; occasional exposure to unprotected heights and moving mechanical parts; and unskilled work involving simple tasks and simple work-related decision making, and asked the VE whether the described individual could perform any of Siple-Niehaus's past work.  Tr. 63.  The VE responded that the described individual would be able to perform the cashier job and the production assembler job.  Tr. 63.  The VE also indicated that the described individual would be able to perform other work, including (1) wire worker, a light, unskilled job with 750 jobs available in northeast Ohio and 105,000 nationally; (2) electronics worker, a light, unskilled job with 450 jobs available in northeast Ohio and 60,000 nationally; and (3) assembly press operator, a light, unskilled job with 650 jobs available in northeast Ohio and 105,000 nationally.  Tr. 64.

The ALJ then asked the VE whether there would jobs available if the limitation of light work was reduced to sedentary work in the first hypothetical.  Tr. 64-65.  The VE indicated that Siple-Niehaus's past work would not remain available.  Tr. 64.  He indicated that the three jobs previously identified would remain available but the numbers would be reduced so he provided sedentary, unskilled jobs available, including (1) table worker with 400 jobs available in northeast Ohio and 54,000 nationally; (2) bench hand with 650 jobs available in northeast Ohio and 95,000 nationally; and (3) final assembler with 600 jobs available in northeast Ohio and 90,000 nationally.  Tr. 64-65.

---

[6] The VE was not certain that Siple-Niehaus reached substantial gainful activity with respect to the nursing assistant job but indicated he would leave that for the ALJ to decide.  Tr. 63.

The ALJ then asked the VE to assume an individual who could perform a range of sedentary or light work but would need more than two customary breaks per day, which would cause the individual to be off-task more than 20% of the workday because of an inability to maintain concentration, persistence and pace due to chronic pain or might miss more than two days per month due to illness.  Tr. 65.  The VE indicated that the described individual would not be able to maintain full-time employment.  Tr. 65-66.  The VE also indicated that employers of employees performing unskilled work generally would not tolerate an employee being off-task more than 10% of the workday or missing more than one day per month on an ongoing, regular basis.  Tr.  66.

Siple-Niehaus's counsel questioned the VE, asking whether there would be work available to the individual described in the first hypothetical if an additional restriction of no production pace, no fast-paced kind of work was added.  Tr. 66.  The VE indicated that the three identified jobs would remain available.  Tr. 66.  The VE also indicated that his response to the second hypothetical, which limited the individual to sedentary work, would not change if the limitation of no production pace, fast-paced work was added.  Tr. 66.  Also, the VE stated that his response to the second hypothetical would not change if the limitation of frequent pushing and pulling was changed to occasional pushing and pulling.  Tr. 67.   Finally, the VE indicated that, if the second hypothetical was modified from frequent overhead reaching on the right to occasional reaching, it would impact the availability of jobs only if the limitation was bilateral. Tr. 67.

### b.    Post-hearing interrogatory

Following the hearing, on November 4, 2013, the ALJ sent an interrogatory to the VE (Tr. 325-327) asking the VE to consider the same limitations included in the first hypothetical

presented at the October 8, 2013, hearing with the additional limitations of "only occasional contact with the public in a low stress work environment." (Tr. 326).   In response, on November 6, 2013, the VE stated that "yes" the three jobs previously identified in response to the first hypothetical, i.e., wire worker, electronics worker, and assembly press operator, would remain available.  Tr. 329-330.  On November 18, 2013, the ALJ proffered this additional information to Siple-Niehaus, allowing Siple-Niehaus the opportunity to, among other action, submit written comments regarding the evidence, provide a statement of facts and law that the claimant thought applied to her case in light of the evidence, submit written questions to the VE, request a supplemental hearing and request the opportunity to question the VE regarding the additional evidence.  Tr. 331-332.  In her November 26, 2013, response to the proffer of the additional evidence (Tr. 334-342), Siple-Niehaus, through her attorney, asked the ALJ to consider certain items prior to rendering  a decision: (1) "'Low stress work environment'" limitation is ambiguous[;]" (2) "The hypothetical question is incomplete:  inability to concentrate and sustain activity, and need for a quiet working environment not captured[;]" and (3) "Regulatory factors support giving weight to opinions of Drs. Lewis and Hassani[.]" (Tr. 334-337).

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[7] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[8] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[9] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[7] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[9] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her December 20, 2013, decision, the ALJ made the following findings:[10]

1.      Siple-Niehaus met the insured status requirements through December 31, 2013.  Tr. 19.

2.      Siple-Niehaus had not engaged in substantial gainful activity since September 8, 2010, the alleged onset date.  Tr. 19.

3.      Siple-Niehaus had the following severe impairments: migraine headaches, degenerative disc disease of the cervical spine, major depressive disorder and post traumatic stress disorder (PTSD).  Tr. 19.

4.      Siple-Niehaus did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 20-21.

5.      Siple-Niehaus had the RFC to perform light work except she was limited to frequent pushing and pulling with hand controls on the right, frequent overhead reaching on the right, no climbing of ropes, ladders, or scaffolds; occasional exposure to unprotected heights and moving mechanical parts; unskilled work involving simple task and work-related decision making; occasional contact with the public in a low stress work environment.  Tr. 21-28.

6.      Siple-Niehaus was capable of performing past relevant work as a cashier and production assembler.  Tr. 28.  Alternatively, considering Siple-Niehaus' age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Siple-Niehaus could also perform, including wire worker, electronics worker, and assembly press operator.  Tr. 28-29.

Based on the foregoing, the ALJ determined that Siple-Niehaus had not been under a

disability from September 8, 2010, through the date of the decision.  Tr. 29-30.

---

[10] The ALJ's findings are summarized.

## V. Parties' Arguments

Siple-Niehaus raises a number of arguments regarding the ALJ's consideration and weighing of the opinions rendered by her treating pain management specialist Dr. Lewis[11] regarding how Siple-Niehaus's pain would impede her ability to concentrate and interfere with her ability to sustain work.  Doc. 15, pp. 13-22, Doc. 19, pp. 1-7.  Siple-Niehaus also challenges the ALJ's Step Four and Step Five findings.  Doc. 15, pp. 22-24, Doc. 19, pp. 7-9.  More particularly, Siple-Niehaus argues that the Step Four finding is not supported by substantial evidence because the hypothetical question posed to the VE did not include all limitations included in the RFC.  Doc. 15, pp. 22-23, Doc. 19, pp. 7-8.   Siple-Niehaus also argues that the Step Five finding is not supported by substantial evidence because the post-hearing interrogatory to the VE, which asked the VE whether the same three jobs identified at the hearing would remain available if there was an additional limitation of "occasional contact with the public in a low stress work environment," did not ask the VE to confirm that the same number of jobs would remain available.  Doc. 15, pp. 23-24, Doc. 19, pp. 8-9.   Also, Siple-Niehaus argues that the limitation of a "low stress work environment" is generic and does not provide meaningful vocational limitations.  Doc. 15, pp. 24-25, Doc. 19, pp. 8-9.

In response, the Commissioner argues that the ALJ's decision makes clear that the ALJ provided little weight to Dr. Lewis's opinions and did not adopt Dr. Lewis's opinion that Siple-Niehaus would be off-task 20-30% of the time.  Doc. 18, p. 6.  The Commissioner also argues that the ALJ reasonably gave less than controlling weight to Dr. Lewis's opinions and properly

---

[11] Siple-Niehaus indicates that she is not focusing on another medical opinion dated August 30, 2011 (Tr. 511-513), which the ALJ attributed to Dr. Hassani, Siple-Niehaus's primary care physician, because the signature on that opinion is not legible and Siple-Niehaus is not certain that the opinion was in fact completed by Dr. Hassani.  Doc. 15, pp. 18-19, n. 3.

weighed the medical opinion evidence in accordance with the Regulations.  Doc. 18, pp. 7-13.

Further, the Commissioner contends that the ALJ reasonably accounted for the limitations in

Siple-Niehaus's concentration that the ALJ found credible. Doc. 18, pp. 14-15.  The

Commissioner argues that the Step Five finding is supported by substantial evidence and error, if

any at Step Four, was harmless.  Doc. 18, pp. 15-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

*F.3d 611, 614 (6th Cir. 2003)*.  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be

conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v.*

*Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ's RFC and VE hypothetical adequately accounted for difficulties with concentration**

Relying on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), Siple-Niehaus contends that the ALJ accepted Dr. Lewis's opinion that Siple-Niehaus's pain would prevent her ability to concentrate occasionally and, at Step Three, found that Siple-Niehaus had moderate difficulties in concentration but did not adequately account for limitations in concentration in the RFC.  Doc. 15, pp. 13-15.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray the claimant's physical and mental impairments." *Ealy*, 594 F.3d at 517.  In *Ealy*, the ALJ relied upon a physician's assessment that included speed- and pace-based restrictions.  594 F.3d at 516.  However, the ALJ did not rely on a vocational expert hypothetical containing a fair summary of those speed and pace based restrictions.  *Id.*  Instead, the ALJ's hypothetical only limited the claimant to simple, repetitive tasks and instructions.  *Id.*  The Sixth Circuit concluded that the hypothetical did not adequately describe the claimant's limitations and, as a result, the vocational expert's testimony did not constitute substantial evidence in support of the ALJ's Step Five determination.  *Id.* at 516-517.

*Ealy*, however, does not establish a bright-line rule for how ALJs must account for limitations in concentration, persistence or pace.  *See Jackson v. Comm'r of Soc. Sec.*, 2011 WL 4943966, *4 (N.D. Ohio Oct. 18, 2011) (finding that "*Ealy* stands for a limited, fact-based, ruling in which the claimant's particular moderate limitations required additional speed - and pace-based restrictions").  The ALJ found that Siple-Niehaus had limitations in her ability to concentrate and, contrary to Siple-Niehaus's contention, the ALJ adequately accounted for

27

limitations in concentration.  Tr. 20, 26, 27.   In particular, the ALJ concluded that "Dr. Lewis'
opinion as to the claimant's occasional difficulties with concentration is fully accommodated by
the restriction to simple, routine tasks set forth in the residual functional capacity."[12]  Tr. 26-27.
*See e.g., Starr v. Comm'r of Soc. Sec.*, 2013 WL 653280, * 3 (S.D. Ohio Feb. 21, 2013) (finding
that an ALJ adequately accounted for claimant's deficits in concentration by limiting claimant to
"simple, routine work involving no more than 3-4 steps").[13]   *Ealy* is distinguishable because,
unlike the physician's opinion at issue in *Ealy*, here, Dr. Lewis did not include specific speed or
pace-based restrictions in her opinion.  As found by the ALJ, Dr. Lewis's opinion regarding the
impact of Siple-Niehaus's headaches on her ability to concentrate was vague.  Tr. 26.  Also, as
noted by the ALJ, Dr. Dallara, who conducted a psychological consultative evaluation, observed
no objective deficits in Siple-Niehaus's memory or concentration and Siple-Niehaus's treating
mental health providers consistently indicated that Siple-Niehaus's memory and concentration
were "fair."  Tr. 21.

Siple-Niehaus claims that the ALJ ignored Dr. Lewis's opinion that Siple-Niehaus would
"likely be off task 20% to 33% of the time," and that the ALJ was required to incorporate Dr.
Lewis's opinion regarding the percentage of time that Siple-Niehaus would likely be off-task
into the RFC.  Doc. 15, p. 14.  However, the ALJ discussed and, in fact, quoted Dr. Lewis's
opinions and weighed Dr. Lewis's opinions.  Tr. 26-27.  Thus, the record does not support Siple-

[12] Additionally, the ALJ explained that Siple-Niehaus's allegations regarding her difficulty concentrating were
supported but only to the extent described in the RFC.  Tr. 26 (discussing Siple-Niehaus's mental health treatment
history and her allegations regarding her problems concentrating).  Siple-Niehaus has not challenged the ALJ's
credibility determination.  Accordingly, arguments pertaining to the ALJ's assessment of her credibility have been
waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory
manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a
party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." )
(internal citations omitted).

[13] The ALJ in this case specifically found that Siple-Niehaus had the mental RFC to perform "unskilled work
involving simple task and work-related decision making; occasional contact with the public in a low stress work
environment."  Tr. 21.

Niehaus's claim that the ALJ ignored evidence.  Also, in assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  Rather, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a); 20 C.F.R. § 416.1546(c).  Thus, "the ALJ—not a physician—ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec*., 391 Fed. Appx. 435, 439 (6th Cir. 2010). Additionally, as discussed below, the ALJ provided only little weight to Dr. Lewis's opinions and Siple-Niehaus has not shown error with respect to the ALJ's consideration of Dr. Lewis's opinions.  Accordingly, Siple-Niehaus has not shown that the ALJ's decision not to include Dr. Lewis's opinion regarding the amount of time that Siple-Niehaus would be off-task in the RFC amounts to reversible error.

Based on the foregoing evidence, Siple-Niehaus has failed to demonstrate that the ALJ's RFC and corresponding VE hypothetical did not adequately portray the limitations that the ALJ found credible and supported by the evidence.

## B.    The ALJ properly considered the opinions of treating physician Dr. Lewis

Siple-Niehaus argues that Dr. Lewis's opinions were entitled to controlling weight and/or the ALJ failed to provide good reasons for assigning little weight to Dr. Lewis's opinion.  Doc. 15, pp. 15-22.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable

29

clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

   If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

   After discussing the details of Siple-Niehaus's allegations and her physical and mental health treatment history, the ALJ discussed and weighed Dr. Lewis's opinions, explaining,

> The undersigned gave the conclusions of Drs. Lewis and Hassani little weight as they are not supported by objective medical evidence.  Dr. Hassani cited none of his own clinical findings in support of his opinion, instead referring to an unspecified "pain management report" which purportedly indicates that "generally medical intervention has been minimally effective."  Dr. Hassani's conclusions as to this point are directly contradictory to those of Dr. Lewis, who just two weeks earlier indicated that medication management and occipital nerve block had effectively diminished the claimant's symptoms.  Dr. Lewis' August 15, 2011 conclusion as to the impact of the claimant's headaches on her ability to concentrate is too vague to be of significant persuasive value.  Dr. Lewis' opinion as to the claimant's occasional difficulties with concentration is fully accommodated by the restriction to simple, routine tasks set forth in the residual functional capacity.

Tr. 26-27.

Siple-Niehaus contends that Dr. Lewis's opinions were entitled to controlling weight because Dr. Lewis provided objective findings, i.e., her diagnoses of migraine cephalgias, cervicogenic headaches, and bilateral occipital neuralgia and her specific clinical findings, including positive bilateral nystagmus, positive occipital pain with palpation around greater and lower occipital region, positive diminished cervical extension, and positive facet loading bilaterally.  Doc. 15, p. 18.  However, the ALJ discussed the very evidence that Siple-Niehaus argues supports Dr. Lewis's opinions.  Tr. 26.  Further, contrary to Siple-Niehaus's claim, the ALJ did not discount Dr. Lewis's opinion because she did not include medical findings.  Rather, the ALJ concluded that Dr. Lewis's opinions were not supported by the objective medical evidence.  Tr. 26.  As discussed by the ALJ, the medical evidence showed that, during a consultative psychological examination, there were no objective deficits in Siple-Niehaus's concentration or memory.  Tr. 22 (citing Exhibit 8F, Tr. 663-669).  Also, as indicated by the ALJ, Siple-Niehaus's treating psychiatrist consistently described Siple-Niehaus's memory and concentration as "fair."  Tr. 20 (citing Exhibit 13F, Tr. 722-787).   The ALJ also considered the results of diagnostic testing, finding said results not entirely supportive of Siple-Niehaus's allegations.  Tr. 23.  The ALJ also considered evidence regarding Siple-Niehaus's response to various treatments for her ongoing headaches as well as her decision to forego treatment suggested by Dr. Lewis.  Tr. 23-24.  The ALJ considered the foregoing evidence along with other evidence of record and concluded that Dr. Lewis's opinions were not supported by objective medical evidence and it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *See Garner*, 745 F.2d at 387.

In arguing that Dr. Lewis's opinions were entitled to controlling weight, Siple-Niehaus also takes issue with the ALJ's reliance upon a conflict between Dr. Lewis's opinion regarding

the effectiveness of treatment and Dr. Hassani's office's opinion regarding the effectiveness of treatment. Doc. 15, pp. 18-19. However, Siple-Niehaus has not shown that the opinion from Dr. Hassani's office and Dr. Lewis's report were not entirely consistent with respect to their opinions as to the effectiveness of treatment. *Compare* Tr. 489 (Dr. Lewis's August 15, 2011, opinion stating medication management (20-30%) effectiveness and occipital nerve blocks (100% effectiveness, awaiting spinal cord stimulator decision) *with* Tr. 513 (Dr. Hassani's August 30, 2011, opinion indicating that "generally medical intervention has been minimally effective"). Siple-Niehaus suggests that the ALJ improperly took into consideration Dr. Lewis's opinion that there had been relief from the occipital nerve block because Siple-Niehaus later reported that her pain relief lasted only three days. Doc. 15, p. 19. However, her argument is not persuasive because the ALJ also considered the fact that Siple-Niehaus reported no sustained relief from occipital nerve blocks (Tr. 24) and, as set forth above, it is not for this Court to try the case *de novo*, resolve conflicts in evidence or decide questions of credibility. *Id.*

Siple-Niehaus also contends that the ALJ did not provide good reasons for providing little weight to Dr. Lewis's opinion. An ALJ is required to provide good reasons for the weight assigned to a medical opinion but not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The ALJ considered the nature and extent of the treatment relationship that Dr. Lewis had with Siple-Niehaus. Tr. 26 ("Jamesetta Lewis, D.O., the claimant's treating pain management specialist since November 21, 2010 . . . ). Siple-Niehaus argues that Dr. Lewis's opinions are consistent with other records relating to Siple-Niehaus's attempts to get her pain under control and therefore the ALJ should have assigned more weight to her opinions. Doc. 15, p. 21.

However, the ALJ provided a detailed analysis and discussion of Siple-Niehaus's medical treatment history yet, as discussed above, the ALJ found Dr. Lewis's opinions not supported by objective medical evidence.  Tr. 26.  Also, the ALJ explained that Dr. Lewis's opinion was too vague to be of significant persuasive value.  Tr. 26-27.  Siple-Niehaus has not shown that the ALJ's reasons for providing little weight to Dr. Lewis's opinions are not supported by substantial evidence.  Further, it is not for this Court to reweigh the evidence and, even if Siple-Niehaus could demonstrate that her treatment records provide support for her claim, since there is substantial evidence to support the ALJ's decision, the Court may not overturn the Commissioner's decision.  *Jones*, 336 F.3d at 477.

For the reasons discussed herein, the Court finds no error with respect to the ALJ's consideration of Dr. Lewis's medical opinions.

**C.     The ALJ's Step Five finding is supported by substantial evidence**

Siple-Niehaus contends that the ALJ's Step Five finding is not supported by substantial evidence for two reasons.  Doc. 15, pp. 23-24, Doc. 19, pp. 7-9.

First, she argues that the Commissioner did not meet her burden at Step Five because there was insufficient evidence to support the ALJ's finding that there were other jobs existing in significant numbers in the national economy that Siple-Niehaus could do.  Doc. 15, pp. 23-24. She contends the evidence is lacking because, when asked in a post-hearing interrogatory regarding whether jobs would remain available with an additional limitation of "only occasional contact with the public in a low stress work environment" added to the first hypothetical, the VE only confirmed that the three jobs identified at the hearing, i.e., wire worker, electronics worker, and assembly press operator, would remain available (Tr. 329) but was not asked whether the jobs would remain available in the same numbers identified at the hearing.  Doc. 15, pp. 23-24.

The Court finds that reversal and remand is not warranted for further VE testimony regarding job incidence numbers for the jobs identified.  At the hearing the VE identified job incidence data for the three jobs identified in response to the first hypothetical, i.e., a total of approximately 1800 in northeast Ohio and over 260,000 nationally for the three identified jobs.[14] Tr. 64.  In response to the post-hearing interrogatory, the VE confirmed that the same three jobs would remain available even with the additional limitation.  Tr. 329.  As he did during the hearing when asked about changing the hypothetical from light to sedentary, the VE could have modified or qualified his response.  Tr. 64 ("[S]ome of the jobs I gave you, the wire worker, electronics worker, assembly press operator, some of those would remain, but the numbers would be significantly reduced.").  However, he did not.  In light of the foregoing, the Court finds that the VE's response to the post-hearing interrogatory along with his testimony at the hearing regarding the job incidence numbers for the three identified jobs constitutes substantial evidence to support the ALJ's Step Five finding.[15]

Second, Siple-Niehaus contends that the ALJ's limitation of a "low stress work environment" is ill-defined and therefore the VE's testimony in response to the hypothetical does not constitute substantial evidence.  Siple-Niehaus argues that what makes work stressful is highly individualized but she has not shown that the ALJ's limitation does not accurately describe her limitations.  Nor has she shown that a more detailed definition was required or necessary in this case.  Consistent with SSR 85-15, the ALJ concluded that the evidence supported some mental impairment limitations and included those limitations, including

---

[14] Siple-Niehaus does not contend that these numbers do not represent a significant number.

[15] Also, although provided the opportunity to take action in response to the ALJ's proffer of post-hearing VE evidence (Tr. 331-332), Siple-Niehaus did not raise this issue (Tr. 331-342).  Accordingly, it appears that this claim may have been waived.  *See e.g., McPherson*, 125 F.3d at 995–996.

unskilled work as well as low stress work, in the RFC and asked the VE a hypothetical that accurately described those limitations.  *See* SSR 85-15, 1985 WL 56857, * 6 ("Since the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job . . . [a]ny impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.").  While Siple-Niehaus may disagree with the ALJ's RFC assessment, she has not shown that the VE hypothetical did not accurately portray the limitations found by the ALJ to be credible..

For the reasons set forth herein, substantial evidence supports the ALJ's Step Five finding and there is no basis for reversal or remand.[16]

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: May 17, 2016

Kathleen B. Burke
United States Magistrate Judge

---

[16] Since there is no error regarding the ALJ's Step Five finding, error, if any, at Step Four would be harmless.  Thus, it is not necessary for the Court to address Siple-Niehaus's Step Four argument.